IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KUNAL SHAH,<br><br>        Plaintiff,<br><br>  v.<br><br>MEDITAB SOFTWARE, INC., et al.,<br><br>        Defendants. | HONORABLE JEROME B. SIMANDLE<br><br>Civil Action<br>No. 16-8864 (JBS-JS)<br><br>**<u>OPINION</u>** |

APPEARANCES:

Kevin M. Costello, Esq.
Drake P. Beardon, Jr., Esq.
COSTELLO & MAINS
18000 Horizon Way, Suite 800
Mt. Laurel, NJ 08054
    Attorneys for Plaintiff

David E. Strand, Esq.
Sarah Wieselthier, Esq.
FISHER & PHILLIPS LLP
430 Mountain Avenue, Suite 303
Murray Hill, NJ 07974
    Attorneys for Defendant

**SIMANDLE,** District Judge:

I.    **INTRODUCTION**

    Plaintiff Kunal Shah ("Plaintiff") brings this action against Defendants Meditab Software, Inc. ("Meditab"), Medical Supply Corp., Midesh "Mike" Patel ("Defendant Patel"), and John Does 1-10 (collectively, "Defendants") alleging that Defendants breached its contracts with Plaintiff and/or that Plaintiff was terminated from his employment with Defendant Meditab in retaliation for

engaging in "whistle-blowing" activity in violation of New Jersey's Conscientious Employee Protection Act ("CEPA"). Currently pending before the Court is Defendants' motion for summary judgment. For the reasons discussed below, the motion will be granted in part and denied in part.

## II. FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. Factual Background

Meditab builds software for doctors. (Patel Dep. [Docket Item 32-5] at 20:21-22.) Defendant Patel is the Chairman of Meditab's Board of Directors. (Id. at 10:5-7.) Medical Supply Corp. d/b/a Elmhurst Pharmacy, Inc. was, at all relevant times, a business with complete control over Meditab and the owner and operator of Meditab. (Compl. [Docket Item 1] at ¶ 3.)

Plaintiff began working for Meditab in 2001. (Pl.'s Dep. [Docket Item 38-1] at 39:25-40:3.) When he first started, his job duties and responsibilities included doing business case review, testing, and deployment. (Id. at 43:7-12.) Plaintiff was initially

---

[1] For purposes of the instant motion and pursuant to Local Civil Rule 56.1, the Court looks to the Complaint [Docket Item 1] when appropriate, Defendants' Statement of Undisputed Material Facts [Docket Item 32-1], Plaintiff's Counterstatement of Undisputed Material Facts [Docket Item 38 at 1-14] and Response to Defendants' Statement of Undisputed Material Facts [Docket Item 38 at 14-19], Defendants' Response to Plaintiff's Counterstatement of Undisputed Material Facts [Docket Item 40-1], and related exhibits and documents. The Court distills this version of the record in the light most favorable to Plaintiff, the non-moving party.

compensated between $36,000 to $42,000 per year and he was not paid any commissions at this time. (Id. at 43:13-20.)

According to Plaintiff, in 2004 or 2005, he was promoted to a sales position and, in this role, he earned around $60,000 in base salary plus commission for any sales he made. (Id. at 44:20-45:15.) At this time, Plaintiff's commission started at 8% of gross sales, but could go up to 12% depending on how much volume he sold. (Id. at 46:4-47:6.) The parties agreed that Plaintiff would invoice his commissions through Plaintiff's company, Aqua Healthcare. (Id. at 23:7-21.) Plaintiff would then receive his commissions as salary from Aqua Healthcare. (Id. at 23:22-24:7.)

In 2010 or 2011, Plaintiff began running CosmetiSuite, a division (or "product line") of Meditab, as its division head. (Id. at 47:15-48:5.) Defendant Patel agreed to provide Plaintiff with 25% of the net proceeds of the sale of CosmetiSuite, in the event it was sold. (See Apr. 20, 2013 Email [Docket Item 32-9] at 2) ("I have mentioned to you that based on your thoughts in cosmetic, I plan on giving u net proceeds of 25% from that sale."); see also Pl.'s Dep. at 51:4-12.) To date, CosmetiSuite has not been sold and remains one of Meditab's product lines. (Id. at 55:13-15.) Accordingly, Plaintiff still retains his 25% stake in the product line.

On or about January 15, 2015, Plaintiff became the President and CEO of Meditab. (See Jan. 15, 2015 Email [Docket Item 32-10]

at 2.) The terms of Plaintiff's compensation as President and CEO of Meditab are set forth in an email thread exchanged between Plaintiff and Defendant Patel, dated February 4, 2015, wherein Plaintiff states, in relevant part:

> My compensation as president & CEO: We have agreed too [sic] 10% of the net profits of Meditab with a min wage of $3,36,0000 [$336,000][2] a year if the net profit does not meet the mentioned salary Am currently drawing $1,80,000 [$180,000] a year. (For any reason If the net profit does not meet $1,56,000 [$156,000] a year this amount will be added to my salary as a part of my salary compensation & the min compensation I will make is Three Hundred & Thirty Six Thousand dollars [$336,000] per calendar year.

(Agreement [Docket Item 32-11] at MediTab-Shah 62-63.) Plaintiff's February 4, 2015 employment agreement was for a term of three years and required that he provide at least 3 months (90 days) notice of his resignation. (Id. at MediTab-Shah 63) ("3 months [notice] minimum or forfeit 6 months of bonus. Sorry but we cannot bend on this as you are too valuable and time consuming to replace.").

On December 10, 2015, Plaintiff sent an email to the Meditab Board of Directors with the subject "Time to Move on," wherein he wrote:

> Please let this letter serve as my resignation as President & CEO of Meditab Software Inc effective March 10th with 90 day notice.
>
> * * * *
>
> I assure you that you will continue to enjoy same commitment from me during this transition period. Please

---

[2] The parties appear to be in agreement that the numbers in brackets are correct.

> advise me who I should work with to transition my responsibilities. I wish you and the company the best in the future.

(Dec. 10, 2015 Email [Docket Item 32-13] at 2.) Plaintiff testified that he contemplated resigning at this time due to "day-to-day interference of Mike Patel" and "the operations, you know, aggressive behavior, you know, which does not help stabilize the company." (Pl.'s Dep [Docket Item 38-3] at 125:16-25.) According to Plaintiff, however, he did not actually resign on March 10, 2016 (90 days after he sent the December 10, 2015 email) because his resignation was never accepted. (Id. at 134:9-14.)

Plaintiff's alleged whistle-blowing activity, which is said to have occurred between June and July of 2016, can be summarized, in the light most favorable to Plaintiff, as follows:

- **Bribing an Indian public official**: On June 9, 2016, Plaintiff learned from Jay Shah (via email) that one of Defendants' employees, Vikas (Last Name Unknown), had paid a bribe to a labor official in India. (Pl.'s Answer to Defs.' First Set of Interrog. [Docket Item 38-6] at 5.) Plaintiff conducted an investigation into the payment of the labor officer and confirmed from Sunil Lodha that a bribe was in fact paid to the official. (Pl.'s Dep. [Docket Item 38-3] at 186:2-24.) When Plaintiff learned of this, he wrote an email stating that next time the company's attorneys will take care of any issues with the labor officer. (Id. at 186:20-25.) He also had a conversation with Paragi Patel, Sunil Lodha, Dipal Patel, and Jay Shah and told them that "this

5

is not the way to complete an investigation," and that if there were fines they had to pay, they need to pay the fines and "cleanup the records," so they will not be fined in the future. (Id. at 185:2-24.) Plaintiff testified that after the bribe was paid, he specifically told Defendant Patel that Defendants should not be participating in the payment of bribes to the Indian Labor Office. (Pl.'s Dep. [Docket Item 38-4] at 227:4-21.)

- **Terminating Jay Shah's employment without cause**: Jay Shah is Plaintiff's cousin. On December 1, 2015, Jay Shah signed an employment contract with Meditab that stated once he passed a three-month probation period, his employment "can be terminated on two months' notice on either side." (Shah Employment Offer [Docket Item 38-9] at MediTab-Shah 1231.) The contract also stated Jay Shah could be "terminated without notice" if he engaged in any number of different infractions. (Id. at MediTab-Shah 1232, ¶ 6.) On July 12, 2016, Defendant Patel instructed Plaintiff to terminate Jay Shah for cause because Jay Shah had, according to Defendant Patel, hired employees who did not meet the minimum aptitude test score. (Pl.'s Dep. [Docket Item 38-3] at 194:2-195:2; see also July 12-14, 2016 Emails [Docket Item 38-10] at MediTab-Shah 83-91.) Plaintiff explained to Defendant Patel that this was incorrect because Jay Shah was not responsible for hiring people. (Pl.'s Dep. [Docket Item 38-3] at 195:4-10.) Another employee, Avinash Vyas, conducted an independent investigation and determined there was no cause to fire Jay Shah. (July 12-14, 2016 Emails [Docket Item 38-10] at MediTab-Shah 89.) Defendant Patel still insisted that Plaintiff fire

>       Jay Shah. (Id. at MediTab-Shah 90.) Plaintiff threatened
>       to resign rather than terminate Jay Shah without cause.
>       (Pl.'s Dep. [Docket Item 83-4] at 202:17-21.)

On July 14, 2016, Plaintiff's last day of employment with Meditab, Defendant Patel sent Plaintiff an email stating:

> I understand you left in the middle of the day yesterday because you were upset. Today also you came in for a few minutes.
>
> Jay [Shah] will not be coming back. We have to have a conversation about hand over if you are planning on quitting. If you want to stay we will need to agree on how we will work together. I will not have my [CEO] disrespect me or us. I will not have my [CEO] telling others whether they should ignore or not respond to my communication.

(July 12-14 Emails [Docket Item 38-10] at MediTab-Shah 100.)

Plaintiff responded:

> I did not leave in the middle of the day I was forced to leave with political & unlawful decisions made. I was still working from home until 3.00AM IST time. Today I came inn [sic] as Dipal wanted to see me and team leads had questions. I was not there for few mins was there for 2 hrs.
>
> With the way you have had me work and want me [to] work [I] am sorry I cannot agree as I cannot act as your puppet and cannot continue to work with your unlawful & Predatory actions. . . .

(Id.) Plaintiff testified about this email exchange:

> The thing is I just wanted to cool down. I just wanted [Defendant Patel] to cool down. I just wanted him to rethink that [terminating Jay Shah] is not the right way. You know, it's just trying to create more friction. It's just trying to create more friction. And even after I wrote that, I was still working. I was still processing, you know, emails. I was still working with

7

the teammates, etc. It's just that I wanted him to cool down.

(Pl.'s Dep. [Docket Item 38-4] at 213:13-22.) Plaintiff also testified that he told staff in the India office that he was not stepping down, but that if Defendant Patel continued to act in an illegal manner, Plaintiff had no choice but to leave the company. (Id. at 206:23-207:11.)

Plaintiff sent an email to Human Resources at 1:20 P.M. on July 14, 2016, requesting one week off because he needed treatment for his back. (July 14, 2016 Email [Docket Item 38-12] at 2-3.) This email was forwarded by Paragi Patel to Defendant Patel at 1:53 P.M. (Id. at 2.) Defendant Patel then emailed Human Resources, Paregi Patel, and Plaintiff at 5:29 P.M. the following:

> Dear hr,
>
> Kunal has been terminated effective immediately. Not sure why we are getting this email.
>
> Kunal please plan to turn in all of your equipment tomorrow. Someone will come to your home to pick it up. Let's try to get this transition done smoothly for the sake of all.
>
> Your sick days and vacation pay will be reimbursed. I think you were on vacation in india for a few days last week. Your commissions and bonus will also be taken care of. Work with paragi and hr to compete [sic] this.
>
> Please do not email other staff or clients going forward. Wish you the very best.

(Id.) Defendant Patel later testified he believed Plaintiff "fired himself" when he learned Defendants terminated the contract of Jay Shah. (Midesh Patel Dep. [Docket Item 38-14] at 43:17-44:1.)

**B. Procedural History**

Plaintiff's Complaint was removed to this Court on November 30, 2016. [Docket Item 1.] In the Complaint, Plaintiff alleges: breach of contract relating to unpaid commissions and compensation earned (Count One); breach of implied covenant of good faith and fair dealing (Count Two); violation of CEPA as to Defendants Meditab and Medical Supply Corp. (Count Three) and Defendant Patel (Count Four); wrongful termination under Pierce v. Ortho Pharma. Corp., 84 N.J. 58 (1980) (Count Five); and "request for equitable relief" (Count Six). [Id.]

Following discovery, Defendants filed the pending motion for summary judgment on all counts. [Docket Item 32.] Plaintiff opposed the motion [Docket Item 38], and Defendants filed a reply brief. [Docket Item 40.] Plaintiff subsequently filed an unauthorized sur-reply [Docket Item 41], which the Court will not consider because Plaintiff did not seek leave of Court before filing this brief, as required by Local Civil Rule 7.1(d)(6).[3] See, e.g., Carroll v. Delaware River Port Auth., 2014 WL 3748609, at *1 n.2 (D.N.J. July 29, 2014) (disregarding sur-reply because "[d]efendant failed to ask for, much less receive, permission to

---

[3] As described in the Court's Order dated May 2, 2019 [Docket Item 45], the Court will, however, consider Exhibit P from the sur-reply [Docket Item 41-1 at 4-48], for the limited purpose of attempting to narrow the parties' dispute with regard to the contracts from 2010 through 2015 that form the basis of Plaintiff's claim of unpaid commissions for the time of trial.

9

file a sur-reply prior to filing the sur-reply"). On April 26, the Court convened oral argument on the motion for summary judgment. [Docket Item 44.] The motion is now fully briefed and ripe for disposition.

**III. STANDARD OF REVIEW**

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. The non-moving party "need not match, item for item, each piece of evidence proffered by the movant," but must present more than a "mere scintilla" of evidence on which a jury could reasonably find for the non-moving party. Boyle v. Cty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Anderson, 477 U.S. at 252).

## IV. DISCUSSION

### A. Breach of Contract Claims (Count One)

In Count One, Plaintiff alleges that Defendants breached contracts with Plaintiff for commissions and compensation earned. (Compl. at ¶¶ 11-15, 43-44.) In New Jersey, a party alleging a breach of contract must establish: "(1) a valid contract; (2) breach of that contract; and (3) damages resulting from that breach." Bruck v. Gorman, 2015 WL 9459920, at *5 (D.N.J. Dec. 23, 2015) (quoting Lee v. A to Z Trading LLC, 2014 WL 7339195, at *2 (D.N.J. Dec. 23, 2014)). The Court first addresses whether Defendants are entitled to summary judgment on Plaintiff's breach of contract claims for unpaid commissions before turning to whether Defendants are entitled to summary judgment as to Plaintiff's separate breach of contract claims related to compensation earned.

#### 1. Unpaid Commissions

In the Complaint, Plaintiff alleges "[f]rom 2009 to 2014, as part of his compensation, plaintiff was to receive commissions," and that "[d]espite [the] clearly outlined contractual agreement, defendant was not paid either the full commission, or any commission at all from the years 2009 until 2014." (Compl. at ¶¶ 12-13.) According to Plaintiff's testimony, beginning in 2004 or 2005 his contract with Defendant Meditab stated that he would receive commission on 8% of gross sales, and the percentage would increase up to 12% depending on how much volume he sold. (Pl.'s

Dep. [Docket Item 38-1] at 46:4-47:6.) Plaintiff would invoice his commissions through his company, Aqua Healthcare, and Plaintiff would then receive his commissions as salary from Aqua Healthcare. (Id. at 23:7-24:7.) Plaintiff testified that in 2009 he started noticing he was not being paid all commissions, and that in 2012, 2013, 2014, and 2015 he complained to Defendants about not being paid his full commission. (Id. at 242:23-243:10.) Plaintiff further identified, in Exhibit P of his motion papers [Docket Item 41-1 at 4-48], a schedule containing the proposed contracts that he negotiated and for which he claims a commission was due when the contracts were ratified. At oral argument it became clear that Plaintiff was unable, through the course of normal discovery, to determine which proposed contracts were finalized and upon which a commission was not paid to him. For these reasons, on May 2, 2019, the Court ordered that:

> Defendants search their records with regard to all proposed contracts listed in Exhibit P, and indicate for each: (1) whether the proposed contract was eventually finalized, or whether there is no record of such a contract having been finalized, and (2) whether, if the contract was finalized, it already gave rise to a full commission payment to Plaintiff.

[Docket Item 45 at 2.] Thereafter, the parties were instructed to meet-and-confer and identify the matters that remain in dispute regarding underpaid commissions for the time of trial. Examining the evidence in the light most favorable to Plaintiff, and with this limited discovery process still ongoing, the evidence could

reasonably suggest that there are outstanding commission payments owed to Plaintiff. This material fact is in dispute. Accordingly, the Court will deny Defendants motion for summary judgment on Plaintiff's claims for breach of contract as to unpaid commissions.

### 2. Compensation Earned

In addition to the unpaid commission claims, Plaintiff separately alleges that "[f]rom 2015 until 2016, as part of his compensation, plaintiff was to receive a portion of the year's profit distribution from the defendants," but that he "did not receive the full profit distribution, or any distribution at all from 2015 until 2016 when he was terminated." (Compl. at ¶¶ 12-13.) Ultimately, this dispute centers around a very poorly drafted contract between the parties, the meaning of which the Court is unable to discern as a matter of law.

The terms of Plaintiff's compensation as President and CEO of Meditab are set forth in a confusing e-mail thread exchanged between Plaintiff and Defendant Patel dated February 4, 2015, which states, in relevant part:

> My compensation as president & CEO: We have agreed too 10% of the net profits of Meditab with a min wage of [$336,000] a year if the net profit does not meet the mentioned salary Am currently drawing $1,80,000 [$180,000] a year. (For any reason If the net profit does not meet [$156,000] a year this amount will be added to my salary as a part of my salary compensation & the min compensation I will make is [$336,000] per calendar year.

(Agreement [Docket Item 32-11] at MediTab-Shah 62-63.)

In 2015 and 2016, 10% of Meditab's profits were $169,851.14 and $236,923.57, respectively, and Meditab paid Plaintiff (via Aqua Healthcare) $336,000 in each of those years. (Meditab Profit & Loss Statements [Docket Item 32-12].) Defendants argue that Plaintiff was properly compensated because, under the agreement set forth above, "Plaintiff's total compensation as CEO and President was 10% of the net profits of Meditab, with a minimum compensation of $336,000 a year if 10% of the net profits did not meet this amount." (Defs.' SMF [Docket Item 32-1] at ¶ 19.) Plaintiff, on the other hand, maintains that, under the compensation agreement, "Plaintiff was paid a base salary of $180,000 per year plus 10 percent of the net profits for Meditab," and "[t]he agreement also stated Plaintiff would receive a minimum salary of $336,000 per year total, so if 10 percent of net profits was not at least $156,000, Plaintiff would automatically receive the $336,000 per year. (Pl.'s CMF [Docket Item 38] at ¶¶ 23-24.) According to Plaintiff, "[s]ince 10 percent of the profits for 2015 and 2016 were more than $156,000, . . . Plaintiff should have earned $349,851.14 ($180,000 + [$]169,851.14) for 2015 . . . [and] Plaintiff should have earned $416,923.57 ($180,000 + $236,923.57) for 2016." (Pl.'s Opp. Br. at 6.) In other words, if Plaintiff's interpretation of the contract is correct, he is still owed approximately $14,000 for 2015 and $81,000 for 2016.

14

"Where the meaning of contract language is at issue, a party is entitled to summary judgment 'only if the contract language is unambiguous,' such that it 'is subject to only one reasonable interpretation.'" 2000 Clements Bridge, LLC v. OfficeMax North America, Inc., 2013 WL 3821461, at *4 (D.N.J. July 23, 2013) (quoting Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 522 (3d Cir. 1999)). "While 'the threshold inquiry as to whether contract terms are ambiguous is a legal question,' the interpretation of an ambiguous contract term is left to the fact finder." 2000 Clements Bridge, 2013 WL 3821461, at *4 (quoting Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 n.2 (3d Cir. 1993)).

The Court finds that the terms of Plaintiff's compensation agreement are ambiguous, at best. Giving Plaintiff the benefit of all favorable inferences, the evidence could fairly suggest that Plaintiff's interpretation of the contract is the correct one and a reasonable jury could, therefore, find that Defendants breached its compensation agreement with Plaintiff and that Plaintiff suffered damages as a result thereof. Accordingly, summary judgment will be denied as to Plaintiff's breach of contract claims related to unpaid compensation.

### B. Breach of the Covenant of Good Faith and Fair Dealing Claim (Count Two)

In Count Two, Plaintiff alleges that Defendants breached the implied covenant of good faith and fair dealing. (Compl. at ¶¶ 16-20; 45-46.) "In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; which means that in every contract there exists an implied covenant of good faith and fair dealing." Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997) (internal citations omitted). Under New Jersey law, "a breach of the covenant of good faith and fair dealing must not arise out of the same conduct underlying an alleged breach of contract action." TBI Unlimited, LLC v. Clear Cut Lawn Decisions, LLC, 2013 WL 6048720, at *3 (D.N.J. Nov. 14, 2013). The Court does not discern in the pleading or any of Plaintiff's filings a distinct factual predicate for a breach of the implied covenant of good faith and fair dealing that is separate from the conduct underlying Plaintiff's breach of contract allegations in Count One. Accordingly, the Court will grant Defendants' motion for summary judgment as to Count Two as duplicative of Count One. See Oravsky v. Encompass Ins. Co., 804 F. Supp. 2d 228, 239 (D.N.J. 2011) (dismissing plaintiff's claim of breach of the implied covenant of

16

good faith and fair dealing because "it is duplicative of the breach of contract claim").

C. **CEPA Claims (Counts Three and Four)**

In Counts Three and Four, Plaintiff alleges he engaged in "whistle-blowing" activity, as summarized above, and that he was terminated by Defendants on July 14, 2016 as a result of this activity, in violation of New Jersey's Conscientious Employee Protection Act ("CEPA"). (Compl. at ¶¶ 21-41, 47-52.)

In analyzing a claim made under CEPA, the court conducts a three-step analysis. First, the court must determine if the plaintiff has established a prima facie case of retaliatory discharge. See Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 92 (3d Cir. 1999). To set forth a prima facie case, a plaintiff must establish:

> (1) he or she reasonably believed that his employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3c; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

Battaglia v. United Parcel Serv., Inc., 70 A.3d 602, 625 (N.J. 2013). Second, once a plaintiff has shown a prima facie case, the burden shifts to defendant to articulate some legitimate non-discriminatory reason for making the adverse employment decision. See Blackburn, 179 F.3d at 92 (citing Kolb, 727 A.2d

525, 530-31 (N.J. Super. Ct. App. Div. 1999)). Finally, the burden shifts back to the plaintiff who, in order to survive summary judgment, must raise a genuine issue of fact that the articulated reason is a pretext for the retaliation or that a discriminatory reason more likely motivated the employer. See Blackburn, 179 F.3d at 92 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

Defendants have moved for summary judgment on one basis: that Plaintiff cannot meet the third prong of his prima facie case because, according to them, Plaintiff voluntarily resigned from Meditab in December 2015, before any of the alleged "whistle-blowing" activity took place, and it was Plaintiff's choice to finally leave his employment in July 2016. (Defs.' Br. [Docket Item 32-2] at 4-7.) At this stage, and given the genuine disputes of material fact surrounding the circumstances of Plaintiff's departure from Meditab, the Court cannot find, as a matter of law, that Plaintiff voluntarily resigned (i.e., that he was not "terminated" by Defendants).

The Court recognizes that Plaintiff's December 10, 2015 email very clearly put Defendants on notice of Plaintiff's intent to resign on March 10, 2016. But all parties agree that Plaintiff, in fact, continued to work for Meditab until July 14, 2016. According to Plaintiff, this was because "[w]e did follow-through, and there was a mutual meeting between me, Mike, Paragi and Kal to continue."

18

(Pl.'s Dep [Docket Item 38-3] at 136:7-14.) A reasonable jury could credit Plaintiff's testimony and find that Defendants chose not to accept Plaintiff's resignation in December 2015. Moreover, viewing the evidence, including emails exchanged between Plaintiff, Defendants, and others,[4] in the light most favorable to Plaintiff, a reasonable jury could also conclude that he was "terminated" on July 14, 2016 (<u>i.e.</u>, that Plaintiff suffered an "adverse employment action"). Finally, this same jury could reasonably conclude that, prior to his termination, Plaintiff had engaged in "whistle-blowing" activity (by complaining about the alleged bribe of an Indian official, or for resisting the purportedly unlawful termination of his cousin, or both), and that this activity caused his termination. For these reasons, summary judgment will be denied as to Plaintiff's CEPA claims.

    **D.    Remaining Claims (Counts Five and Six)**

Finally, at oral argument, Plaintiff voluntarily withdrew Counts Five and Six. [Docket Item 44.] Accordingly, the Court will dismiss these counts without prejudice to Plaintiff's right to seek "equitable relief" as to the remaining claims.

---

[4] For example, on July 14, 2016, Defendant Patel emailed Human Resources stating that Plaintiff "has been terminated effective immediately" and instructing Plaintiff to "please plan to turn in all of your equipment tomorrow." (July 14, 2016 Email [Docket Item 38-12] at 2-3.)

## V. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment as to Count Two and deny Defendants' motion as to Counts One, Three, and Four. Counts Five and Six were withdrawn by Plaintiff at oral argument and will be dismissed. The accompanying Order will be entered.

| | |
|---|---|
| **May 23, 2019** | **s/ Jerome B. Simandle** |
| Date | JEROME B. SIMANDLE |
| | U.S. District Judge |